32 C.C.P.A.(Patents)

## NELSON v. HAINSWORTH.

### Patent Appeal No. 4959.

Court of Customs and Patent Appeals.

April 9, 1945.

Rehearing Denied May 22, 1945.

A. G. Gross, of Chicago, Ill., and John F. Robb and Harry C. Robb, both of Cleveland, Ohio, for appellant.

Cameron, Kerkam & Sutton, of Washington, D. C. (Loyd H. Sutton, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, awarding priority to the party Hainsworth, thus reversing the decision of the Examiner of Interferences, in an interference proceeding involving a single count which reads as follows:

"In a continuous absorption refrigerating system of the type in which an inert gas is used as a pressure equalizing agent, the combination of a boiler, an absorber, an evaporator, gas conduits for circulating the inert gas between the evaporator and the absorber and for conveying refrigerant from the evaporator to the absorber, mechanical pumping means in one of said conduits for raising the pressure of the gas therein to a total pressure higher than that normally prevailing in the evaporator and means for circulating absorption liquid between the boiler and the absorber and utilizing the gas at the raised pressure to promote the liquid circulation."

The count originated as claim 2 in a patent, No. 2,027,927, issued to the party Nelson January 14, 1936, upon an application, serial No. 692,366, filed October 6, 1933, application for reissue of which, serial No. 105,241, was filed October 12, 1936. It was copied by the party Hainsworth into his application, serial No. 664,-475, filed April 5, 1933.

The Nelson patent and his reissue application are shown to be assigned to The, Hoover Company of North Canton, Ohio, of which he was an employee, and the Hainsworth application to Servel, Inc., of New York, of which he was vice-president in charge of engineering.

The interference was declared January 31, 1938, between the Nelson reissue application and the Hainsworth application, which latter antedated by about six months the original Nelson application. So, Hainsworth is the senior party and the burden was upon Nelson to establish priority by a preponderance of the evidence.

In the brief for Nelson it is said:

"This case is somewhat unusual in that the questions to be decided are more involved than usually arising in interference causes. In other words, the issues which are raised by this appeal have to do with:

"First: Priority of invention.

"Second: The inoperativeness of the system of Hainsworth as disclosed in his application.

"Third: Originality as between the parties in view of the disclosure to Hainsworth of certain conception evidence of Nelson.

"Fourth: Whether the law of estoppel in pais and by deed is applicable to Hainsworth by reason of the licensing situation between the privies of the parties hereto, and the actions of the party Hainsworth. * * *

"Fifth: Whether Hainsworth and his assignee, Servel Inc., in privity herein, are bound by the acknowledgement of ownership in Nelson's privy of the invention in controversy under the licensing contract."

It is proper to state just here that while the decision of the board reversed the decision of the Examiner of Interferences, there was disagreement in their conclusions upon *only one* of the issues above quoted from the Nelson brief—that of the *inoperativeness* of the Hainsworth apparatus disclosed in his application. The Examiner of Interferences agreed with Nelson on that issue, but disagreed with him as to all the other issues. So, the reversal by the board was directed to a single issue, and upon all other issues we have concurring decisions by the Patent Office tribunals.

To state the matter somewhat differently, both the Examiner of Interferences and the board held that both Hainsworth and Nelson were restricted to their respective filing dates (Nelson being given the benefit of the date on which his original application was filed—October 6, 1933) for both conception and reduction to practice; that Hainsworth was not shown to have derived the invention from Nelson; that Hainsworth was not estopped, and that Hainsworth and his assignee were not bound under the licensing contract (hereinafter explained) in any manner which precluded Hainsworth from contesting

with Nelson the question of priority as to the count involved.

In the appeal to .us Nelson set forth seventy-eight separate reasons for appeal which are grouped in his brief under five headings corresponding to the issues as delineated in the quotation from his brief, supra—that is, (1) priority; (2) inoperativeness; (3) originality; (4) estoppel, and (5) ownership.

It is obvious that a reversal of the board's holding that the Hainsworth application disclosed an operative apparatus would be conclusive of the controversy, and, therefore, it is appropriate that this phase of the case receive first consideration,

A full and accurate description of the respective devices as visualized from the drawings appears in the decision of the Primary Examiner on a motion by Nelson to dissolve, in which motion inoperativeness of the Hainsworth device, as described in his application, was alleged, and we here reproduce same in connection with photographic reproductions of the respective drawings. The Nelson drawing is as follows:

*Inventor*
*Rudolph S Nelson.*
*By Harry S. Duncan Atty.*

This, together with the pertinent part of the specification, was explained by the Primary Examiner as follows:

"In the apparatus shown in the Nelson reissue application a solution of ammonia water is heated in a boiler B. Ammonia is distilled off from the water and the ammonia vapor passes through a conduit 14, a rectifier R, and a pipe 16 to a reabsorber C. In the reabsorber C the ammonia vapor is absorbed by water which enters the reabsorber through conduit 17. The ammonia water formed in reabsorber C passes through a conduit 19 to the top of an evaporator E. A relatively heavy or dense inert gas such as air or nitrogen is forced into conduit 19 through conduit 39 and this gas causes the ammonia water to flow upwardly in conduit 19 from the reabsorber C to the evaporator E. The ammonia water and dense inert gas mix together and pass downwardly over baffles in the evaporator E. When the ammonia water and dense inert gas mix together ammonia evaporates from the ammonia water into the dense inert gas because of the partial pressure of the dense inert gas in the gas space in contact with the ammonia water. This evaporation of the ammonia from the ammonia water produces the cooling.

"The water from which the ammonia has been evaporated in evaporator E flows by gravity through a conduit 17 from evaporator E back to reabsorber C.

"The mixture of dense inert gas and ammonia vapor formed in evaporator E passes through a conduit 31, the compartment 32 of a gas heat exchanger, conduit 33, pump P and a conduit 34 to a conduit 29. Water from which ammonia has been distilled off in boiler B passes through conduit 29 and the mixture of dense inert gas and refrigerant is forced into the water in said conduit 29 from conduit 34 and lifts the water upwardly to the top of absorber A. In the upper portion of the left hand leg of the conduit 29 and in the absorber A the refrigerant is absorbed by the water and the ammonia water thus formed flows by gravity through reservoir 25 and conduit 26 back to boiler B. The water does not absorb the inert gas.

"The inert gas from which the ammonia vapor has been absorbed passes through conduit 35, through the gas heat exchanger compartment 36, tubes 37, compartment 38 and conduit 39 from which it forces its way into the liquid (ammonia water) in conduit 19. The pump P driven by motor M causes the dense inert gas to circulate through its circuit, that is, conduit 34, upper part of the left leg of conduit 29, absorber A, conduit 35, heat exchanger chamber 36, tubes 37, heat exchanger chamber

38, conduit 39, upper part of left leg of conduit 19, evaporator E, conduit 31, compartment 32 of the gas heat exchanger, and conduit 33.

"Forcing the dense inert gas from conduit 34 into liquid in the upper part of the left leg of conduit 29 causes liquid to circulate between absorber A and boiler B. Forcing the dense inert gas into the liquid in the upper left leg of conduit 19 causes liquid to circulate between evaporator E and reabsorber C.

"As has been previously stated, the ammonia vapor boiled out of the ammonia water in boiler B passes through conduit 14, rectifier R and conduit 16 to reabsorber C where the ammonia is absorbed by water that enters through conduit 17 and leaves through conduit 19. Any gas that is not absorbed in reabsorber C, such as inert gas that may accidentally work its way along with the ammonia to reabsorber C, is vented to inert gas conduit 35 through the top of small chamber 21 and conduit 41."

The Hainsworth drawing is as follows:

INVENTOR.
H. R. Hainsworth
BY
ATTORNEY.

The Primary Examiner's explanation of this drawing together with the pertinent part of the specification reads:

"In the apparatus disclosed in this application, ammonia water is heated in generator 10. Ammonia is distilled off from the ammonia water and the ammonia vapor passes through a rectifier 14, and a conduit 13 to a condenser 15. In condenser 15 the ammonia vapor is cooled and condenses to liquid ammonia.

"The liquid ammonia flows from the condenser through a conduit 16 to an evaporator 17. An auxiliary medium, such as hydrogen, is forced into evaporator 17 through a conduit 33 that is provided with openings 34. The hydrogen bubbles upwardly through the liquid ammonia and the liquid ammonia evaporates by diffusing into the hydrogen. This evaporation of the liquid ammonia produces cooling.

"The mixture of ammonia and hydrogen formed in evaporator 17 passes through a conduit 35, one part of a heat exchanger 31, a conduit 36, and a pipe 37 into an absorber 18.

"Water from which ammonia has been distilled flows from generator 10 through one part of a heat exchanger 27 and through a conduit 28 to the lower part of the absorber 18.

"The absorber 18 comprises a vessel 19 divided by a partition 20 into an upper chamber 21 and a lower chamber 22. A conduit 23 extends from the bottom of chamber 22 upwardly through the partition 20 into the upper chamber 21 and is provided at its lower end with openings 24 affording communication with the chamber 22.

"The pipe 37 through which the mixture of hydrogen (inert gas) and ammonia enters the absorber opens into the lower part of conduit 23 above the apertures 24. The mixture of hydrogen and ammonia that enters conduit 23 bubbles upwardly through the water therein. The refrigerant is absorbed by the water (absorbent) in conduit 23 and the gas bubbles of hydrogen and ammonia, or perhaps of hydrogen alone decrease the weight of the fluid column in this conduit until an overflow occurs from the upper end thereof into the upper chamber 21 of the absorber.

"A conduit 25 extends through the partition 20 and provides an overflow that determines the liquid level in chamber 21. Liquid (ammonia water) flows by gravity from chamber 21 through conduit 29, one part of heat exchanger 27 and conduit 30 to the part of generator 10.

"Hydrogen is drawn from the upper part of absorber 18 through conduit 32 by a gas pump or blower 38 and is pumped

through on part of heat exchanger 31 and conduit 33 to evaporator 17.

"A small drain 39 is provided between evaporator 17 and heat exchanger 31, which Hainsworth states, is his description, 'provides for return of excess liquid refrigerant to the absorption liquid circuit.' "

It may be stated at the outset that neither the Nelson apparatus (although patented) nor that of Hainsworth has ever been produced and placed on the market as a commercial device, or at least neither had been at the time of the trial of the controversy below. The board said:

" * * * Neither of the machines involved here can be said to be conventional and whether or not they can ever be made to operate satisfactorily commercially remains to be seen. * * * "

■ The burden, of course, rested upon Nelson, as the junior party, to establish the inoperativeness of the Hainsworth device by a preponderance of the evidence, his motion to dissolve having been denied by the Primary Examiner. He accordingly introduced evidence on this point, which was very fully reviewed in the decision of the Examiner of Interferences.

It appears that during the taking of the testimony in chief on his behalf he caused certain machines purporting to conform to the Hainsworth design to be constructed. Photographs of the first of such machines were introduced in evidence as Nelson's Exhibits 29 and 29A. Subsequently the first machine was redesigned, and photographs of such redesigned apparatus were introduced in evidence as Nelson's Exhibits 31 and 31A. A third form was produced and introduced in evidence as Nelson's Exhibit 30, together with photographs marked as Exhibits 47 and 47A.

All the foregoing forms seem to have been tested inter partes during the trial, and a record was kept which was introduced in evidence as Nelson's Exhibit 43. In his decision the examiner said, inter alia, "All inter-partes tests * * * which are given in Nelson exhibit 43 as well as the testimony relative thereto indicate that no refrigeration was produced by any of the forms of this apparatus," but he further held that Nelson's evidence on this point did not establish a prima facie case of inoperativeness, saying:

"Although the apparatus as constructed by Nelson appears to approximate the apparatus shown in the Hainsworth application drawing rather closely, yet the fact that the pumping means used was incapable of overcoming the liquid head in the apparatus renders the test inconclusive so far as establishing inoperativeness of the Hainsworth apparatus is concerned. It would seem obvious from the Hainsworth description that a pumping means must be used which is capable of producing circulation in the gas circuit."

His subsequent finding that Nelson had established a prima facie case of inoperativeness was based in part upon the evidence introduced by Hainsworth, but principally, as we understand his decision, upon rebuttal evidence introduced by Nelson.

Had Hainsworth rested his case concerning this feature of the controversy on the inadequacy of Nelson's evidence, he would not, as it subsequently developed, have been confronted with the final adjudication of the Examiner of Interferences against him, but, as of course, he could not foretell what the views of the Examiner of Interferences would be, and accordingly he introduced evidence in the effort to establish operativeness affirmatively.

Just here it may be said that Nelson's counsel argued below and also before us that Hainsworth's action in introducing such testimony was a concession on his part that Nelson had established a prima facie case of inoperativeness, and, as we understand it, in effect argues that, for this reason, the board's decision on this phase of the controversy should be reversed. We think this contention is untenable, and we agree with the statement of the Examiner of Interferences saying:

"It would seem obvious * * * that the senior party should be free to establish operativeness of his own application disclosure if he so desires, without thereby being at the disadvantage of having admitted that the junior party had necessarily established a prima facie case."

Hainsworth also constructed an apparatus in conformity with a drawing which he prepared (which drawing is in evidence as Nelson's Exhibit 56) which was introduced in evidence as Hainsworth's Exhibit E. The Examiner of Interferences stated, "This drawing shows a refrigeration apparatus approximating that shown in the Hainsworth application drawing," and this seems to have been conceded by Nelson. It is also stated by the Examiner of Inter-

ferences that it was "tested inter-partes during the taking of the Hainsworth testimony." As we understand the record, some of the tests which were made, concerning which testimony was adduced, were not made inter partes but were made ex parte in the Servel plant, and no records of those were kept. The inter partes test appears to have been made after Hainsworth's Exhibit E had been modified in certain particulars so that it was in the form shown in a photograph introduced in evidence as Hainsworth Exhibit N. An intermediate form is shown in another photograph introduced as Hainsworth Exhibit T, but we do not understand that there was any inter partes test of the latter form.

In the decision of the Examiner of Interferences it is said:

"* * * Ashby, a refrigeration engineer employed by Servel testified that the apparatus was constructed according to the drawing, Nelson exhibit 56, except for certain changes which included a slight raising of the condenser and the trap at the lower portion of conduit 16 was made somewhat deeper. The pump used to circulate the inert gas was of a positive displacement type having a packing gland around the shaft and being belt driven from a motor. According to the testimony of Ashby this apparatus was tested ex parte and was found to produce refrigeration. He defined refrigeration as any evaporator temperature below the cooling water inlet. * * * No records were apparently kept and the results of the tests were reported orally to Dr. Taylor of the Servel Company. The blades of the pump were graphite lubricated when the pump was assembled and apparently each of the tests on this apparatus terminated with the sticking of the blades. The pump was then disassembled, the blades lubricated and the pump assembled for the succeeding tests. Following these tests, the apparatus was modified by lowering the generator with respect to the absorber and evaporator. Ashby stated the purpose of this modification as follows:

"So we could get a steadier liquid circulation. * * *

"After being modified in this manner the apparatus again allegedly produced refrigeration until the pump failed through the sticking of the blades. Apparently the pump was disassembled, relubricated and another test made with similar results. According to the testimony of Ashby these

tests on the modified apparatus indicated that it was capable of producing refrigeration for a few hours but in each case the testing period was apparently terminated when the pump failed. Ashby testified that he kept Taylor advised concerning the results of these tests but no records were kept."

It appears that after the above tests, a different type of pump (evidently not new in the art), referred to as "the Williams pump" and described by the Examiner of Interferences as a "sealed pump wherein the rotor is driven by means of a magnetic yoke through a nonmagnetic casing," was secured and utilized; that certain internal structural elements susceptible to corrosion by the ammonia solution were replaced; that an oil separator was constructed and installed to provide continuous lubrication to the pump and to separate the lubricant from the circulated gases, and that the evaporator was raised with respect to the absorber. This constituted the device shown in Hainsworth Exhibit T. It was tested ex parte and Ashby testified that refrigeration was produced over a considerable period of time, but no records were kept.

It appears that in the final form as shown in Hainsworth Exhibit N (the form tested inter partes), the evaporator was further raised and installed in a refrigerator box, and that the entire unit was raised by attaching extensions to its legs, the latter stated to be for preventing the instability of the assembly.

Following the Hainsworth testimony rebuttal testimony was taken on behalf of Nelson, during the taking of which other machines were constructed by Nelson, or his assignee, and introduced in evidence as Nelson's Exhibit 66 (a photograph of same being also introduced as Exhibit 67), 68, and 73, respectively. Each of the devices was supposed to correspond to forms of Hainsworth's Exhibit E, and each was tested both ex parte and inter partes. It was pointed out by the Examiner of Interferences that "* * * it does not appear that this exhibit 66 of Nelson was in all respects identical with Hainsworth exhibit E although the general construction appears to be the same. * * *" Discussing the testimony concerning this exhibit, the examiner said:

"* * * According to the testimony, it appears that some initial refrigeration was produced which was probably of the flash variety. This appeared to take place

whether heat was supplied to the boiler or not. Where the boiler was heated, intermittent and erratic temperatures apparently followed. It appears further that the solution head in the generator was low and that solution flow did not take place according to theory. The pump appears to have been relatively unsatisfactory since the rotor seized and the gland leaked despite the use of water cooling and graphite lubrication."

Concerning Nelson's Exhibit 68, the Examiner of Interferences said, in substance, that it was constructed according to the Hainsworth drawing, Exhibit L, and therefore conformed essentially to the Exhibit T form of Hainsworth's Exhibit E, but added that it "differed in some measurements."

He further said:

" * * * According to the testimony it appears that intermittent refrigeration was produced but the apparatus was apparently not in equilibrium and solution line temperatures fluctuated considerably. Considerable solution collected in the oil separator and oil apparently found its way into other parts of the apparatus. This would indicate that the oil separator was not wholly satisfactory and that continuous lubrication could probably not be maintained."

With respect to the final form of the Hainsworth device produced by Nelson (Nelson's Exhibit 73), the Examiner of Interferences stated:

" * * * Hainsworth's application disclosure was apparently followed as closely as possible. A Sunbeam positive displacement vane type pump was used as before but instead of using a sealed type of pump as in exhibit 68 the pump was driven by a motor with the shaft passing through a bellows seal and the motor was sealed in a separate container maintained at approximately the pressure existing in the apparatus. An oil separator was installed as in exhibit 68 and in the Hainsworth exhibit E. This apparatus was subjected to extensive tests, both ex parte and inter partes, the results of which appear in Nelson exhibit 74 and 80 respectively. In the first ex parte test there was apparently an initial flash refrigeration whereupon there followed a period of twenty-six hours with no refrigeration except for two short periods when the evaporator temperature dropped slightly below the cooling water temperature. In the tests on this exhibit

73, it appears also that liquid collected in the oil separator with the result that more liquid had to be added to the apparatus."

After reciting in some detail the rebuttal testimony introduced by Nelson, the Examiner of Interferences continued:

"It is believed * * * that a refrigeration apparatus to be operative, must produce evaporator temperatures that are reasonably below that of the cooling water or air and that the functioning of the apparatus must approach an equilibrium which would indicate that solution and gas circulation is relatively constant. Conversely, an absorption apparatus that fails to meet these qualifications, that shows erratic temperature fluctuations of the evaporator and fluid lines when the load and input remains constant or one which shows only an initial period of refrigeration after the apparatus is charged is believed to indicate that is is basically inoperative in the sense that design changes would be necessary to make it operate properly.

"A distinction is here made between the terms operativeness and efficiency. The latter term is ordinarily understood to mean the ratio of output to input or in the case of a refrigeration apparatus it would probably represent the relative amount of cooling produced with a given energy input.

"Many decisions refer to the fact that an apparatus need not function perfectly to be operative. These decisions, however, are believed to refer principally to efficiency and are accordingly not believed to be very pertinent where the question involves erratic operation or where the device fails to operate as planned.

"On this basis it is believed that the apparatus (exhibits 67, 68, and 73) constructed and tested by Nelson inter partes were inoperative. It would also appear that exhibits 68 and 73 which approached the Hainsworth application drawing most closely in construction gave the poorest performance when subjected to tests. For this reason it is believed that the construction and testing inter partes of Nelson's exhibits 68 and 73 established a prima facie case of inoperativeness of the Hainsworth application disclosure. Moreover, it is believed that the Hainsworth exhibits E fail to successfully rebut this showing."

As has been stated, the Examiner of Interferences was of the opinion that Nelson's original evidence failed to establish

prima facie that the Hainsworth system as disclosed in the Hainsworth application was inoperative (a conclusion in which the board, of course, concurred), but he held that the rebuttal testimony taken together with the Hainsworth evidence and Nelson's original evidence did establish a prima facie case, and the board disagreed with that holding.

In its decision the board expressed doubt as to whether the rebuttal testimony of Nelson should be considered, saying:

" * * * At best it is doubtful if this alleged rebuttal testimony has any standing at all in this case * * *."

Notwithstanding the doubt expressed, the board did, in fact, consider the rebuttal testimony, and held:

" * * * It is our view that this testimony is no different from Nelson's prima facie case in that it was directed to the same end as his testimony in chief. * * *."

In discussing the Hainsworth device, Exhibit E, and the testimony relating thereto, the board said, inter alia:

"The Examiner of Interferences has held, however, that the Hainsworth Exhibit E as finally adjusted and tested was a material departure from that shown in the application disclosure. We are unable to agree with this conclusion. * * * In both cases, the drawings are diagrammatic or schematic. It has been the practice of this Office to accept such drawings and it is generally recognized that in converting the abstract ideas conveyed by this type of illustration into concrete apparatus requires the exercise of considerable ingenuity on the part of those skilled in this art. The Hainsworth disclosure shows how the boiler, condenser, evaporator and absorber should be coupled so that the fluids might circulate in the manner described. No mention is made in the Hainsworth application as to the relative levels of the parts mentioned, but it would be obvious to one skilled in this art, such as Dr. Ashby, that these parts should be at such relative heights that the strong aqua would flow back by gravity from the absorber to the boiler and that perhaps several trials would have to be made before the best results could be obtained and this would also be true as to the adjustment of the evaporator and absorber. The record shows that Dr. Ashby and his assistant Soroka did this without the assistance of the inventor.

"It was mainly on this matter of relative levels that the Examiner of Interferences based his decision as to inoperativeness of the Hainsworth disclosure, and it was on this point we hold that the Examiner of Interferences was in error. For reasons stated above we are convinced that, as filed, the Hainsworth application does disclose an operative machine and that it will operate in the manner described.

* * * * *

"We believe that it is generally recognized that machines of the type in issue are difficult to construct so as to operate as efficiently as other forms of refrigerating machines now available. The pressures employed are very high, often in the neighborhood of from 200 to 300 per square inch, and the differences in pressure created by the circulating pump must be small. Therefore, the slight changes in level of the boiler, evaporator and absorber may easily cause serious disturbances in the circulation of the absorbing medium and the gases. In building and testing N Exhibits 66, 67 and 73, Nelson had no incentive to make the machines work and it was not remarkable that said machines did not work efficiently, but even so, they would produce refrigeration at times."

A number of the devices constructed by Nelson and introduced in evidence as exhibits above identified, and one by Hainsworth (Exhibit E, in which were embodied features identified as Hainsworth Exhibits O and S), were displayed before us and explained in great detail in the oral presentation of the case. In consequence of such presentation we feel that we have a fair conception of the structures.

We think it clear that no device, conforming in minute detail to the Hainsworth application, is shown to have been constructed by either party.

On the other hand, we think it is also clear from the evidence that devices which closely approached the drawings of the Hainsworth application were constructed and that they produced refrigeration to an extent sufficient to demonstrate operativeness, and we feel constrained to agree with the holding of the board to the effect that the modifications made were within the purview of those skilled in the art. We, therefore, sustain the board's view upon this phase of the controversy.

It is not deemed necessary to dwell at length upon the other phases of the contro-

versy upon which there was complete agreement by the respective tribunals of the Patent Office. No useful purpose would be served by a detailed rehearsal here of the testimony and arguments concerning them.

Certain sketches introduced in evidence as Nelson's Exhibits 6, 7, and 8 were relied upon to establish Nelson's conception at least as early as October 5, 1931. These sketches were discussed at length by the Examiner of Interferences in his original decision and in a supplemental decision in response to a petition for rehearing and the particular features which he deemed to be lacking were pointed out in detail. The board likewise analyzed them, saying, inter alia:

"* * * Nelson's Exhibit 6 dated February 24, 1931 was a crude freehand sketch disclosing in a general way how the various parts of a refrigerating machine could be assembled but there was no written description of same. Nelson testified at length regarding the operation of the mechanism disclosed in these sketches but there are no records to show that he described the same to others at the time these sketches were made.

"On October 3 and 5, 1931 Nelson prepared sketches N Exhibits 7 and 8. The first merely shows details of the absorber while Exhibit 8 is a close resemblance of the application drawings but lacks certain essential features fully set forth in the decision of the Examiner of Interferences.

"We fully agree with the Examiner of Interferences that the showing made in these three exhibits is insufficient to establish reduction to practice under the doctrine set forth in Mergenthaler v. Scudder [11 App.D.C. 264]. Appellee contends at some length that he should be permitted to combine these early sketches for the purpose of showing conception and, in addition, these certain features from prior patents and has cited Standard Cartridge Company v. Peters Cartridge Company [6 Cir.], 77 F. 630; 1897 C.D. 257. The subject matter in issue in that case was a cartridge filling machine which had reached a high stage of development. Machines of this kind are purely mechanical in action and, hence, the presence of absence of small conventional details were of no great moment.

"The refrigerating machines of the type in issue here are of rather recent development and according to the testimony

in the record, no machines of either the Nelson or the Hainsworth type have been placed on the market. From a theoretical point of view both machines, if made in accordance with the application drawings, should be capable of successful operation and the Primary Examiner has so held.

"The N Exhibit 8 omits the drain to remove excess solution from the evaporator. Otherwise, this sketch shows a close approximation to Nelson's application drawings. The drain is deemed to be essential to the successful operation of the Nelson machine. Nelson contends that such a drain is disclosed in certain prior art disclosing somewhat similar machines but it is noted that the Munters and Altenkirch patents relied on are quite different in structure. We feel the same as the Examiner of Interferences that the strict rule laid down by the Court of Appeals D. C. in the Mergenthaler vs. Scudder case should be followed here. According to this decision, it would be improper to combine the showing in these three exhibits with certain other prior art to establish conception of the invention."

Appellant's extensive argument on this point has received our careful study but we are not convinced that the tribunals of the Patent Office erred either as to findings of fact or as to the law applicable under such findings.

With respect to *actual* reduction to practice, appellant relied upon an apparatus which he caused to be constructed in 1932, introduced in evidence as Nelson's Exhibit 24. Upon the basis of the testimony concerning its operation the board found that refrigeration was produced, *but* pointed out that no structure was embraced in the exhibit which responded to the feature of the involved count, reading:

"* * * means for circulating absorption liquid between the boiler and the absorber and utilizing the gas at the raised pressure to promote the liquid circulation."

The foregoing is a limitation which, under the well-settled rule, may not be disregarded in an interference proceeding.

We, therefore, agree that Nelson must be confined to his filing date for both conception and reduction to practice.

The remaining questions posed by Nelson—originality, estoppel, and ownership—grow out of a certain contract or license

agreement, which is described and passed upon by the board as follows:

"It appears from the record that in February, 1933 the Hoover Company, the assignee of Nelson, and Servel, Inc., the assignee of the party Hainsworth, entered into a license agreement with respect to certain patented inventions and also certain other data regarding ideas in this field which had not yet been embodied in patent applications. One of these ideas was represented by sketches N Exhibits 6 and 7. It appears that there is no question but that representatives of Servel, Inc. did see these sketches at the time stated. Nelson contends that since Hainsworth had knowledge of these sketches at the time stated, he is now estopped from claiming to be the first inventor of same. The Examiner of Interferences has gone into this matter in considerable detail and we agree with his conclusions thereon that the party Hainsworth is not estopped, for as stated above, we must hold that N Exhibits 6 and 7 do not disclose the subject matter in issue and therefore the license agreement cannot act as an estoppel against Hainsworth.

"This conclusion also takes care of the matter of originality. If N Exhibits 6 and 7 do not disclose the issue, then Hainsworth could not have obtained knowledge of the count in issue from the party Nelson. We also agree with the Examiner of Interferences that Hainsworth's Exhibit A1 was far closer to Hainsworth's application drawing than Nelson's Exhibits 6 and 7."

We are in agreement with the foregoing, and it is our view that the reasoning underlying the holding applies equally to the matter of ownership.

The decision of the board is affirmed.
Affirmed.